POLK GRANT et al., Appellees, v. FLEMING BROTHERS COM-
PANY et al., Appellants.

**MASTER AND SERVANT:** Workmen's Compensation Act—"Aris-
ing Out of and in the Course of Employment." Evidence re-
viewed, relative to the scope of a workman's employment and
the circumstances attending his death without eyewitnesses,
and held to support a finding that the death arose out of and in
the course of the employment.

*Appeal from Polk District Court.*—LAWRENCE DE GRAFF,
Judge.

MARCH 12, 1920.

PROCEEDING to recover compensation under the Iowa
Workmen's Compensation Act. The committee of arbitra-
tion made an award. Upon review, this award was con-
firmed by the industrial commissioner. Upon appeal to
the Polk County district court, the order of the indus-
trial commissioner was affirmed, and judgment was entered
for the claimants. From such order and judgment of the
district court, the defendants have appealed.—*Affirmed.*

*Brockett, Strauss & Blake,* for appellants.

*S. Joe Brown,* for appellees.

EVANS, J.—On May 26, 1918, Oscar Grant, an employee
of the defendants, sustained fatal injuries, from which he
died within a few minutes. The one question of controversy
in the case is whether the injury to Grant arose out of and
in the course of his employment. If the affirmative is found
upon this question, the amount of the award has been stip-
ulated by the parties.

There was no witness to the circumstances which were
the immediate cause of the injury. In order to prove, there-

fore, that the injury of decedent arose out of and in the course of his employment, reliance must be had upon circumstantial evidence. The injury resulted from an elevator accident. Grant was a janitor and man of all work about the Fleming Building, a large office building in the city of Des Moines. The accident happened on Sunday. Only one of the three passenger elevators was in operation for passengers on that day. The south elevator, not in use for passengers, was under inspection by its engineers. It was their duty on that day to inspect and oil the same. This duty had been completed only a few seconds before the accident in question. The last conversation with Grant was had with these engineers, Harris and Allen. Grant had been at work, putting in some partitions on the sixth floor. He had some material there, and perhaps other articles, which were to be brought down to the basement by means of an elevator. His purpose was to bring the same down in the south elevator, and this purpose had been communicated to these engineers, and consented to by them. The construction of this elevator is such that a release of the "up-lever" will send it from the basement to the top floor. Likewise, a release of the "down-lever" will send it from the top floor to the basement. The circumstances clearly indicate that, while the elevator was in the basement, Grant had undertaken to enter it, pursuant to his purpose to go after his material on the sixth floor, and that, while he was entering it, the up-lever became, in some manner, released. The upward thrust of the elevator crushed Grant against the floor above, before he had got to a point of safety within. Whether the release of the up-lever was accidental or unintentional, or whether it was done by Grant in an attempt to operate the elevator, is involved in uncertainty. The contention of appellant is that he was operating the elevator, and that such operation was beyond the scope of his employment, and that, therefore, his resulting injury was out-

side of the contemplation of the Compensation Act.

The scope of Grant's employment was testified to by one of his employers as follows:

"Q. Mr. Fleming, did you personally attend to the employment of the deceased? A. Yes, sir. Q. When had he entered the employ of Fleming Bros., Incorporated? A. On about the 10th or 12th of January. Q. And he continued with you until the time of his death? A. Yes, sir. Q. What was his work, and what did he do around there? A. He did janitor work, and helped put in partitions, in making changes up through the building, and helping take up mortar and mix mortar, and was janitor and handy man, to do any work that was to be done. Q. This matter of getting material from the sixth floor,—that was part of his work? A. Yes. Q. Did he have to do anything with this hoist in the rear of the building? A. Yes; almost daily for some time he got out ashes and helped get out freight and get in plaster or mortar and tiles, and everything in connection with building and putting in new partitions, etc., and helping take out furniture. Q. Do you think, Mr. Fleming, he was familiar with the working of the passenger cages? A. I think he was. He did not handle passengers at all. Q. You think a man that could run the freight elevator hoist outside could manage an elevator? A. I think he could from the time he had been running it."

Engineer Harris testified to the last conversation of Grant as follows:

"A. Well, we were inspecting the elevators. We make a system every Sunday of going over all of them. Of course, we go over them during the week, but do the oiling and other things on Sunday. We were just finishing on the south car, and this boy said he wanted to use the car,—that is, Grant,—to get some stuff on the sixth floor; and we told him we would be ready in about ten minutes; and we finished the car. I was the last man out, and left the door

shut, and the lever in a down position; and Grant was not there at that time. We were in the shop, and were wiping grease off of our hands; and just then, he appeared at the shop door, and he says to the assistant engineer, 'I am ready now, Mr. Allen, to get that stuff from the sixth floor,' and Allen answered, 'All right, kiddo, as soon as I get a drink, will bring it down for you.' "

Assistant engineer Allen testified to the same conversation, as follows:

"Q. Where was the deceased when you saw him at that time: that is, after the doors in the basement had been closed? A. He came down the stairway, and said he was ready to go up. Q. Clear down? A. Yes. Q. He was in the basement? A. Yes. Q. You left and went somewhere? A. I went to the sub-basement, after a drink. Q. That is the last you saw of the deceased before the accident? A. Yes, sir. Q. What was it he wanted to do with the elevator, according to what he told you? A. He wanted me to take the elevator up to the sixth floor, after lumber. Q. You indicated that, as soon as you got a drink, you would go with him? A. Yes, sir."

Twenty-five seconds later, the injury had occurred, and these witnesses heard the call of distress. It will be observed, from the testimony of the employer, that the scope of the employment was very broad and indefinite. He was not only janitor, but "handy man, to do any work that was to be done." The only limitation put upon the scope of this employment by this witness was that "he did not handle passengers at all." There is no claim that he was attempting to handle passengers at this time. The clear implication of the testimony of the same witness is that he was familiar with the working of this elevator. There is no claim that he was not justified in bringing down his material from the sixth floor by means of this elevator. The claim is that he was not justified in attempting, himself, to work the ele-

vator, and that he should have waited for Allen to do this. It is very clear that he would have been justified, in the course of his employment, in entering the elevator with Allen, for the purpose of getting his material. Having been assured by Allen that he would go with him, as soon as he got a drink, does the fact that Grant entered the elevator, a few seconds before Allen was expected to follow him, carry him outside the scope of his employment? We cannot think so. Here, again, we must not lose sight of appellants' premise. This premise is that Grant attempted to get into the elevator, not for the purpose of preceding Allen, or waiting for him, but for the purpose of operating the elevator, himself. This premise, however, rests upon an inference from the circumstances which is not essential to plaintiff's case. To draw this inference is more to the interest of the defendants than to that of the plaintiff. As between the two inferences, we think the first has the stronger support in the circumstances.

Be that as it may, we think it fairly appears from the evidence that the scope of this employment was so indefinite, and the nature of it so miscellaneous, and the attempted operation of the elevator, if such, at this time, was so in line with the performance of his immediate conceded duty to remove the material from the sixth floor, that such attempted operation should be deemed, *prima facie* at least, to have been within the scope of his duties. If the fact that Allen intended to go up with him, for the purpose of operating the elevator for him, tended to negative such scope of his own employment, it would only negative it by inference. There is a sense in which the burden of that inference would be on the defendants. There is no evidence that it was the duty of Allen to operate the elevator on this day at all. It does appear that the elevator was not operated on Sunday for passengers. Whether Allen had any duty to perform, pertaining to said material, or whether he was

simply volunteering to aid Grant, does not appear.

We reach the conclusion that the case was properly decided in the successive tribunals through which it has come. The order of the district court is, therefore,—*Affirmed.*

WEAVER, C. J., PRESTON and SALINGER, JJ., concur.